Kinna and Ming, appellants, *v.* A. M. Woolfolk, respondent.

Agreement Without Consideration — *Nudum pactum.*— An agreement by one of three parties to the other two, all three of whom were equally obligated to a fourth party, to procure the payment of their common indebtedness from other resources of an insolvent company, for which they were personal security, is without any valid consideration and void.

Representations of a joint debtor, made to induce his co-debtors to borrow money with which to settle another pre-existing greater obligation, will not render him directly liable therefor. It will be presumed that the principal consideration in such case was the release from their own valid, pre-existing indebtedness.

*Appeal from Lewis and Clarke County, Third District.*

Chumasero & Chadwick and Sanders & Cullen, for appellants.

There is practically but one question presented by the record in this case, and that is as to the consideration for the agreement sued upon and set forth in the complaint. Is there a sufficient consideration shown to support the contract, or is it a mere *nudum pactum?* This case has once before occupied the attention of this court (see 3 Mont. 380), and this identical contract was then subjected to judicial consideration and interpretation. It would be a little singular, to say the least of it, if this contract was in fact without consideration, that this court, upon that appeal, should have overlooked the matter, and remanded a case which was based upon a mere barren agreement in writing to the district court for a new trial. The sufficiency of the consideration of this contract is a point distinctly made by the respondent upon the former appeal, and although there is nothing expressly said in the opinion of the court concerning the sufficiency of the consideration, it was a matter within the issues, and which the court must have found in favor of the appellants, or it would not have reversed the judgment, which

was in favor of respondent, and remanded the case for a new trial. This being the case, the former decision becomes the law of this case, upon this question as well as upon every other embraced within the former ruling, and the court will not now depart from it. *Phelan* v. *San Francisco*, 20 Cal. 45; *Davison* v. *Dallas*, 15 Cal. 82; *Dewey & Smith* v. *Gray*, 2 Cal. 376; *Washington B. Co.* v. *Stewart*, 3 How. 413–424; *Stiver* v. *Stiver*, 3 Ohio, 18, 19; *Booth* v. *Commonwealth*, 7 Metc. 286; *Henly* v. *Rose*, 5 Cranch, 313; *Hosack* v. *Express, etc.* 25 Wend. 313–364.

2. Upon the question of consideration, however, it seems to us that a good and sufficient consideration is expressed in the very first sentence of the agreement set up: "Whereas John Kinna and John H. Ming have this day joined with me in borrowing the sum of twenty-five hundred and seventy-two and ten one-hundredths dollars," says the defendant in his written contract, and this without doubt was the consideration, and intended to be the consideration, at the time he drew the contract. The testimony shows conclusively that this money was borrowed at the earnest solicitation of this defendant. At that time he was the principal stockholder in the Park Ditch Company, which was insolvent; his credit was utterly thereby impaired, and he could not have borrowed the money had plaintiffs not joined with him in doing so, and thereby given him credit. This was a benefit to him, and was a good and sufficient consideration. See Transcript, pp. 16–31. It is a perfectly well settled rule, that if a benefit accrues to him who makes the promise, it is a sufficient consideration to sustain *assumpsit*. *Miller* v. *Drake*, 1 Caines, 45; *Powell* v. *Brown*, 3 Johns. 100; *Forster* v. *Fuller*, 6 Mass. 58; *Townsly* v. *Sumral*, 2 Pet. 182; *Hubbard* v. *Coolidge*, 1 Metc. 92; *Waring* v. *Ayers*, 40 N. Y. 360.

3. But not only is a direct benefit to the promisor a sufficient consideration to support a contract, but if the prom-

isee sustain any *loss* or *inconvenience*, or subject himself to any *charge* or *obligation*, however small the benefit, charge or inconvenience may be, provided such act be performed, or such inconvenience or charge incurred, at the instance of the party to be charged, or, in the language of pleading, at his request, it is sufficient. *Town-sley* v. *Sumral*, 2 Peters, 182; *Seaman* v. *Seaman*, 12 Wend. 381; *Lent* v. *Padelford*, 10 Mass. 230; *Train* v. *Gold*, 5 Pick. 380; *Violett* v. *Patton*, 5 Cranch, 142; *Glasgow* v. *Hobbs*, 32 Ind. 440.

There is no contradiction in the testimony that the note to the bank was executed at the urgent solicitation of this defendant. So anxious was he to procure its execution and borrow the money at the bank that he falsely and fraudulently pretended to appellants that he had called his board of trustees of the Park Ditch Company together, and had had them pass a resolution pledging the receipts of the company for the year 1875 to them as indemnity for the execution of the note in question. Can it be said, or if said, can it be believed, that the defendant would manifest so much anxiety, would in fact lay himself liable to a prosecution for obtaining money upon false pretenses, to procure an act to be done which was of no benefit to himself? But were the appellants injured by signing the note? They incurred an *obligation* to the First National Bank, and that, in and of itself, was a sufficient consideration to support the contract; but it is apparent from the testimony that the indebtedness to Hale was not drawing interest, that is to say, the sum which they had guarantied to be paid, whereas the indebtedness to the bank drew interest. Mr. Kinna testifies: "I paid one-third of the amount of the notes with interest." See Transcript, p. 28.

It should be remembered, in this connection, that this is not a question of *adequacy* of consideration, but whether there was *any* consideration to support this agreement; and in this regard the language of the court in *Hubbard*

v. *Coolidge,* 1 Metc. 92, is peculiarly applicable: "*We cannot estimate, as the parties could, the benefit to one, or the inconvenience to the other. The law does not nicely weigh the amount of benefit to one party, or injury or loss to the other, which will make a legal consideration.*"

Another fact, which should not be overlooked in this connection, was that this transaction not only embraced the borrowing of money to pay an indebtedness for which appellants were liable to Hale, but also the sum of between six and seven hundred dollars for taxes, and for which they were not theretofore liable. See Transcript, pp. 18 and 28, and also the contract set out in the complaint. This certainly was a sufficient consideration, if there had been none other.

4. As to the other points in respondent's motion for a non-suit, they hinge entirely upon this question of consideration. It is alleged that appellants were not damaged, because under any circumstances they would have had to have paid Hale, and it is not to be understood thereby that the failure on the part of respondent to fulfil his written contract with them was not a damage to them. As to whether any proceeds of the Park Ditch Company came to the hands of respondent, that is a question of fact for the jury, and there was evidence in the testimony of Mr. Ming, Mr. Kinna and Mr. Hale, showing that certain proceeds of the company came to the hands of respondent that year.

E. W. & J. K. TOOLE, JOHN H. SHOBER and MASSENA BULLARD, for respondent.

The appellants' brief assumes that this is an action on contract, and its authorities are confined to the question of consideration. On the contrary it is an action of deceit, sounding in tort. The instrument sued on, dated September 16, 1874, sets forth that the Park Ditch Company had pledged to plaintiffs and defendant the note of Wm. Chessman, its claim against Felix Poznainsky, and

any other *demands due it*, to the extent of repaying plaintiffs and defendant the sum of $2,572.10, that day borrowed.

Plaintiffs charge that, in addition to the recitals of the instrument, the defendant, at the time of the execution of the instrument, falsely stated to them that the Park Ditch Company had pledged to them all its resources, including the receipts for water to be sold, and that, by reason of such statements, they were induced to borrow the sum of $2,572.10 and pay the same to R. S. Hale. They further charge that, by reason of such representations, the defendant is estopped from denying the truth thereof. Record, pp. 4, 5, 6.

The defendant in his answer does not deny making the statement that the note of Chessman and the claim against Poznainsky were pledged to plaintiffs and defendant, but only denies to the extent of the charge that he stated that all the resources of the Park Ditch Company, including the future receipts for water, were so pledged, and denies that he is estopped from proving that no resolution pledging the receipts of water for the year 1875 was ever made by the Park Ditch Company. See defendant's answer, Record, pp. 10, 11, 12.

It will be seen from the pleadings and evidence, as well as from the record of the former trial (3 Mont. 380), that there is no issue as to the pledge of the assets recited in the instrument, but only as to receipts of the Park Ditch Company for water sold during the year 1875. Although the recitals of the instrument sued on limit the pledge of the Park Ditch Company to "demands due it," the plaintiffs were permitted to testify as to other verbal statements, which they claimed were made at the time of its execution by defendant, in which they report him as representing that the future and uncertain receipts for water during the year 1875, instead of "demands due," were also pledged to them. They not only enlarge, but contradict the recitals of the instrument, as to what was

pledged by the Park Ditch Company, and then seek to hold defendant responsible for the falsehood, not of the recitals which he himself made in writing at the time, but of those which plaintiffs claim that he verbally made.

Passing by the question of plaintiffs' right to contradict the recitals of the instrument sued on, and basing their cause of action upon the parol clauses grafted on to the instrument by themselves, yet even then the plaintiffs have failed in every essential particular to make a case against defendant. The action is based upon the false representations claimed to have been made by defendant. To make such false representations the basis of an action, it was necessary to show:

1st. That the defendant, by making them, betrayed a confidence which the plaintiffs placed in him, and that their relations were such that plaintiffs had the right to rely upon such representations.

2d. That the plaintiffs were destitute of all information, and the means of acquiring it, as to what had been pledged by the Park Ditch Company.

3d. The plaintiffs must also have been misled by the representations, to their injury.

4th. The plaintiffs must have relied solely upon the representations and been influenced to do an act which they would otherwise not have done. See Story's Equity Jur. secs. 192–8, 201–3; *Boggs* v. *Merced Mining Co.* 14 Cal. 279; *Davis* v. *Davis,* 26 Cal. 23; *Bowman* v. *Cudworth,* 31 Cal. 148; *Martin* v. *Zellerbach et al.* 38 Cal. 300.

In every one of these important essentials, plaintiffs have failed. Both they and the defendant were securities alike for the Park Ditch Company. It was a corporation, as admitted by the pleadings. Record, p. 11. There is nothing in the record to show that defendant occupied any peculiar relation of trust with reference to plaintiffs.

As to the means of information, there is nothing in

the evidence to show that the records of the Park Ditch Company were not equally accessible to plaintiffs and defendant. The law requires such records to be open to inspection, and plaintiffs do not claim that they were debarred from any such privilege. Certainly, too, the language of the very instrument on which they sue, in which these future water receipts are not enumerated, but plainly excluded, was sufficient to put them on inquiry.

But upon the proposition that they were misled to their damage or injury, the plaintiffs especially fail to make out a case. They and the defendant were alike securities for the Park Ditch Company to R. S. Hale for between $16,000 and $18,000, bearing two per cent. per month. They confess the Park Ditch Company was insolvent; that they were uneasy and notified Hale to sue, and only withdrew the notice when they were able to consummate an arrangement with Hale that the receipts of 1874 should be assigned to him, and that, if he received $8,000 from the resources of the company during the season of 1874, he would buy in the ditch and release them from liability as securities — provided they sold it under their mortgage of indemnity. Record, from page 19 to 30, inclusive.

As the ditch was covered by prior mortgages, the plaintiffs did not consider their security at all adequate. Record, pp. 21, 22, 29. At the end of the season of 1874, they still lacked $2,572.10 of paying Hale the $8,000 necessary to secure their release, and the plaintiffs both confess that they would have paid this money without reference to any representations of defendant. Record, pp. 24–29. They both confess that by paying this sum they released themselves from the payment of a larger amount, viz., between $11,000 and $12,000, and that they paid it largely for the purpose of being released. Record, pp. 24, 29, 30.

They confess that they surrendered no security which

they already had, by reason of any representations of defendant; that they did nothing they would not otherwise have done, and that they were benefited by paying the $2,572.10, and consummating the arrangement with Hale. Record, pp. 24, 29, 30.

But perhaps the strongest evidence that plaintiffs were in no way influenced by any representations of defendant with reference to the water receipts of 1875 consists in the fact that, when the contest came up between Hale and the Park Ditch Company over these very receipts, in May 1875, neither of the plaintiffs aided in any manner whatever the Park Ditch Company, then confessedly insolvent, On the contrary, Mr. Ming confesses that he furnished Hale an affidavit to enable him to recover the very receipts, the hope of getting which, he asserts, had influenced him to join in borrowing the $2,572.10. Record, p. 26 (bottom).

The plaintiffs, according to their statement, thoroughly understood the programme by which the defendant expected to hold these receipts of 1875 for the ditch company. They say that it was explained to them that the six months' redemption would not expire until the best of the water season was over, and they were thus partly induced to borrow the money. Record, p. 17 (bottom); also p. 28.

At the time of the contest, in May, 1875, over these receipts, with R. S. Hale, the plaintiffs fully believed that they were entitled to them according to their statement. Their complaint says that they did not discover that said receipts for 1875 had not been so assigned to them until after the commencement of this action, about June 9, 1877, more than two years after the contest with Hale. Record, p. 5, lines 17, 18, 19, 20, 21. Yet, notwithstanding the importance they attached to these receipts, they gave no sign of their interest, but left the defendant to employ counsel from his own means to contest Hale's right to them. Not until they had been se-

cured for the company by the sacrifices on the part of defendant, enumerated in the record (pages 45 and 46), do the plaintiffs remember the verbal statements of defendant, made in September, 1874, to which they testify nearly eight years afterwards, in contradiction of the plain language of the instrument sued on, and their own conduct in the premises.

Here the defendant might rest, as the plaintiffs relied solely upon the alleged misrepresentations of defendant, and did not even introduce the record of the Park Ditch Company, showing that there had been pledged to them any assets of the company whatever. Doubtless they refrained from introducing this record for the reason that it tallied too exactly with the description contained in the instrument sued on to suit their purposes. Incidentally, however, a portion of the Park Ditch records introduced does refer to the assignment to plaintiffs and defendant. Record, p. 45, lines 6 and 7.

But even on the theory of contract on which the plaintiffs' brief proceeds, they fail to make out a case. They fail to show: First, any benefit to the defendant as claimed. The assertion that defendant's credit was impaired, and that he needed the assistance of plaintiffs to borrow his third of $2,572.10, has nothing to sustain it in the record. The record does show that defendant was the largest owner in the Park Ditch Company. Record, p. 30 (bottom).

But he was only equally liable with plaintiffs on the security notes to Hale. Hence, in selling out the ditch under the $8,000 agreement to relieve the plaintiffs and himself from liability, he was sacrificing larger interests than they, although only deriving the same benefit.

The record, too, shows that the $8,000 agreement was made at the instance of plaintiffs themselves after they had notified Hale to sue on the security notes; that they desired it as a measure of protection, and defendant submitted to it, and they only withdrew their notice to

Hale after this agreement was made. Record, pp. 22, 23, 27.

Plaintiff Kinna confesses that he does not know what motive the defendant had to want to carry out an agreement which plaintiffs had inaugurated and close out the ditch. Record, p. 30 (bottom).

But, secondly, the plaintiffs' brief equally fails to show any damage or injury to them. It is alleged in the brief that they were induced by defendant's representations to incur an obligation to the First National Bank in borrowing the $2,572.10. But they were required to pay this sum during the mining season of 1874, in order to secure their release from a larger liability. Record, p. 22, lines 21, 22. They did not pay this sum till September 14, 1874, when the mining season was over. Record, p. 2, line 14 *et seq.* There is nothing in the record to show that they could not have paid the money direct without borrowing it, had they been so disposed.

Mr. Kinna acknowledges that he was not flush in funds at the time, and would have been compelled to borrow his portion of the amount regardless of any representations made by defendant. Record, pp. 29, 30. In any event the plaintiffs allege that they paid their portion of the note within thirty days (Record, p. 6, lines 15, 16), although the very instrument on which they sue precludes any hope or expectation of any receipts under the agreement until the following spring. Record, p. 3, lines 12, 13, 14. So far as the record shows, the borrowing of the money by plaintiffs was entirely voluntary.

As to the other note for $605 for taxes, referred to in plaintiffs' brief, there is nothing in the record to show why it was executed to R. S. Hale. It might perhaps be reasonably inferred that an insolvent corporation had failed to pay its taxes; that Hale, the mortgagee, had paid them for his own protection, and demanded that these back taxes, as well as his $8,000, should be paid, before consenting to buy in the ditch and release plaint-

iffs and defendant from liability. At all events, the plaintiffs have failed to show that defendant was any more responsible than themselves for these taxes. It was a liability for which they chose to execute their note to Hale. It is conceded that plaintiffs only paid their portion of this note to Hale. Record, p. 18, lines 10, 11.

There is certainly nothing in the record to show that this note for taxes was not executed in payment of a just indebtedness to Hale. Nor is there anything to show that the defendant was benefited either directly or indirectly by plaintiffs executing such note, or that they were induced by any representations of defendant to assume it as an indebtedness, although not responsible for it.

So much for plaintiffs' brief.

In conclusion, it is respectfully submitted on the part of defendant, that, by the very terms of the instrument on which this action is brought, the plaintiffs were not entitled to recover. The liability assumed was conditional. The defendant only agreed to apply on the notes executed by plaintiffs and himself such amounts as he might collect "after deducting costs, charges and expenses." Only to this extent he assumed responsibility. See instrument (Record, p. 3).

It is respectfully submitted that plaintiffs wholly failed to show that defendant received any amount whatever from the resources of the Park Ditch Company over and above costs, charges and expenses. No evidence was introduced for the purpose of charging the defendant except as to the Chessman note, the claim against Poznainsky and the water receipts of 1875.

As regards the Chessman note, it distinctly appears from the record that it was claimed by Mr. Hale, and that no payment was made on it to defendant after the date of the instrument sued on. See Chessman's testimony, Record, p. 31, lines 18, 19, 20.

So in regard to the Poznainsky claim. The plaintiffs have wholly failed to designate the nature and amount of

the claim, or to show that it was received by defendant. The instrument sued on refers to "the claim"—not claims—of the Park Ditch Company against Poznainsky as pledged to plaintiffs and defendant. Record, p. 2.

We are left to conjecture both the amount of the claim and what it was for. We only know from the record that it was a claim existing on the 16th of September, 1874, against Poznainsky and in favor of the Park Ditch Company, and assigned by the company about that date to plaintiffs and defendant.

The evidence of Poznainsky (Record, p. 37 *et seq.*) shows conclusively that he was deeply indebted to the defendant, and never paid, except in notes which he never liquidated. This indebtedness was several years in accruing. But Poznainsky expressly negatives the idea that anything was ever paid by him after September 16, 1874, either in notes or otherwise. He claims to know nothing about the affairs of the mine after that date. Record, p. 39, lines 7 to 14 inclusive.

It will be observed that the claim pledged is against Poznainsky and not against the defendant. The evidence, consequently, of Poznainsky that certain bills for water, during a period of years, had been assumed by defendant long before September 16, 1874, would negative the idea that these constituted "the claim" against Poznainsky. Whatever "the claim" was, Poznainsky's evidence shows that no changes occurred with reference to it after September 14, 1874, the date of the instrument sued on, and it devolved upon plaintiffs to prove that the particular claim pledged to them had been collected by defendant, which they wholly failed to do. No attempt was made to prove that defendant had received any other amounts claimed to be applicable to the payment of plaintiffs' demand against the Park Ditch Company, except the water receipts for 1875. For the purpose of tracing these into the hands of defendant, the plaintiffs themselves introduced the records of the Park Ditch Company. See Records, pp. 44–46.

These conclusively show:

1st. That such water receipts did not come into the hands of defendant, but were assigned to A. J. Davis, W. C. Gillette and Samuel Schwab, to indemnify them as securities for the Park Ditch Company. Record, p. 44.

2d. That one-half of such receipts, which amounted altogether to $3,450, were paid out by the company, after settlement with Hale, to T. P. Newton and Massena Bullard in payment for services rendered by them for the company. Record, p. 46, lines 10 to 18 inclusive; also Record, p. 32.

3d. That only $1,725 of these water receipts was paid by the company to the defendant, which was done in partial payment and satisfaction of the various services and sacrifices made by him to obtain said water receipts for the company. See Record, pp. 45, 46.

The recital of those services and his sacrifices made, including water notes to the amount of $8,000, certainly shows an abundant consideration for the charge of $1,725 which was allowed by the company.

The plaintiffs themselves introduced this record. Its recitals stand unimpeached. Even had they not been introduced by plaintiffs, the records of a corporation are the best evidence of its acts, and especially in an action between its members. Angell & Ames on Corp. secs. 83, 679–683; 1 Greenl. on Ev. sec. 493. The plaintiffs, therefore, proved themselves fairly out of court by their own evidence. The defendant had expressly limited his liability in the instrument sued on to such resources pledged as he might collect, after deducting "costs, charges and expenses." The plaintiffs failed to show that he received one dollar of the amounts pledged, and as to the water receipts of 1875, they prove, by the records of the Park Ditch Company, that he only received what was allowed as a "charge" for services and sacrifices in behalf of the company. No evidence was introduced by plaintiffs to show that the charge was unreasonable, and it stands before the court unimpeached. Hence, even holding the

defendant liable to the full measure of responsibility demanded by plaintiffs, he cannot be held accountable under the evidence introduced by plaintiffs themselves upon the instrument sued on.

WADE, C. J.     This is an appeal from a judgment of non-suit. The complaint alleges that on the 16th day of September, 1874, the plaintiffs and defendant entered into a contract in writing, as follows:

"HELENA, September 16, 1874:

"Whereas, John Kinna and John H. Ming have this day joined with me in borrowing the sum of ($2,572.10) twenty-five hundred and seventy-two and $\frac{10}{100}$ dollars for the purpose of paying R. S. Hale the balance of eight thousand dollars due him under private agreement with said Ming, Kinna and Woolfolk, in order for their release from certain notes executed by them to said Hale as security for the Park Ditch Company; and whereas the Park Ditch Company has pledged the note of William Chessman to it, and its claim against Felix Poznainsky, and any other demands due it, to the extent of repaying to the said Ming, Kinna and Woolfolk the sum of $2,572.10, this day borrowed: Now, therefore, the said Woolfolk does hereby agree that if he should collect any of the above amounts, or shall, from any resources whatever of the Park Ditch Company, receive any other sums, after deducting all costs, charges and expenses, to apply the same in payment of said note, and also another note executed to R. S. Hale for taxes, amounting to between six and seven hundred dollars, until said notes shall be fully paid; said payment to be made by the said Woolfolk after his return from the east next spring, and as soon thereafter as the amounts shall be received; but the said Woolfolk does not assume to pay said note only to the extent that he shall receive such amounts from the resources of the Park Ditch Company, as aforesaid.

(Signed)               "A. M. WOOLFOLK."

Which agreement was then delivered to the plaintiffs. And it is further alleged that, as an inducement to the plaintiffs to join Woolfolk in borrowing said sum of money, and thereby to procure the release of the plaintiffs and defendant from certain notes by them jointly executed, and to pay said Hale the sum mentioned in the agreement as due to Hale, the defendant, prior to and at the time of the receipt of the agreement by plaintiffs from the defendant, and the borrowing of the sum of $2,572.10 by them, stated and represented to the plaintiffs that the Park Ditch Company had passed a resolution in conformity with the recitals in the agreement, and relying upon the truth of the representations so made by the defendant, and solely induced thereby, the plaintiffs did execute, together with the defendant, their promissory note for the sum of $2,572.10, and borrowed that sum, which was paid to Hale. And the plaintiffs further aver that until long after the maturity of such note and payment thereof by them, they were ignorant of the fact that the representations of the defendant were untrue and that no such resolution had been passed by the Park Ditch Company, which the defendant well knew, and he is therefore estopped from denying and proving that, in fact, no such resolution had been passed. The plaintiffs further aver that at the maturity of the note for $2,572.10, they paid two-thirds of the amount thereof, together with interest thereon, amounting to the sum of $1,810.14, and also paid two-thirds of the note mentioned in the agreement as due Hale for taxes, amounting to the sum of $445.50. The complaint further charges that the defendant returned from the east in May, 1875, entered into and took possession of the Ditch Company, and received for water sold therefrom for that season, and from the Chessman note, the sum of $3,500, which he should have applied in payment of the sums of money so paid by plaintiffs to Hale, and that he failed to do so; wherefore the plaintiffs demand judgment against him for the sum of $2,255.64.

The answer of the defendant admits the execution of the agreement, but denies that there was any valuable consideration therefor, or any consideration except as in the agreement set forth, and specifically denies each and every other allegation contained in the complaint.

Upon the trial, Ming, one of the plaintiffs, testified as follows: " I am one of the plaintiffs. I know Alex. M. Woolfolk. He was the chief manager of the Park Ditch Company in the fall of 1874. I do not know that he was superintendent. Kinna and myself had a conversation with him the day before, or on the same day of the date of the agreement mentioned in complaint. The conversation took place in my office, in the rear of my store in Helena, Montana territory. Defendant said that the balance of the $8,000 which we owed Mr. Hale was due, and that the Ditch Company had not the money to pay it, and that he had a plan to propose, or a proposition to make, by which we could pay it without incurring any loss to ourselves. That if we would join him and give a note to the First National Bank, and borrow the money, he would get the company to turn over the receipts for water to be sold the following season, and any other sums they might be able to collect to reimburse us in the amount, which was $2,572.10, and also a note which had been given for taxes of over $600. I told the defendant that we could not get the receipts from the ditch, if it was sold in January under the mortgage, as it would be, probably. He then explained to us the provisions of the redemption law, giving us six months to redeem in, after the sale, and said that we could hold the ditch for that time, and that two months of it would be the best of the water season, in which he could collect sufficient money, after paying all expenses, to reimburse us and pay us back fully the sums mentioned. We agreed to do this, if the company would pass a resolution pledging us the receipts for 1875 for this purpose. The defendant then left, but returned the same day, and brought us the

contract set forth in the complaint, signed by himself, and told us that the company had held a meeting and passed a resolution in accordance with his proposition and this agreement. Kinna was present at this time, and we then signed the note for $2,572.10, which note we afterwards paid, and also the note for $605 given for taxes. Kinna, Woolfolk and myself each paid our part of these notes. Defendant returned in the spring of 1875, and, I think, took charge of the Park ditch. The only knowledge I have of the receipts of the Park ditch for the year 1875 was contained in a written proposition made by the defendant to Mr. R. S. Hale, which statement is now lost. I saw it once. It was in the handwriting of the defendant, with which I am well acquainted. In that writing it was stated that the net receipts of the ditch for the year 1875 were $3,500, or about that sum. At the time of borrowing the money, I accepted the statement of the defendant that the company had passed the resolution pledging the water receipts of 1875 to us as true, and I relied upon them, and in consequence thereof executed the note. I did not learn that this statement was false until the following season, when I ascertained that defendant had attempted to pledge the receipts of that season to Mr. Geo. W. Fox, to secure a private indebtedness of his own. I accepted this representation as true, and was thereby induced to sign the note to raise the money."

On cross-examination the witness testified as follows: "I do not remember the date when I discovered that no such resolution had been passed by the company, but it was upon the occasion named. At the time of giving our note to the bank we were responsible to Mr. Hale for between $16,000 and $18,000. We had an agreement with him that if we paid him $8,000, of which this $2,572.10 was the balance, he would release us from all liability. At the time we made the agreement with Hale for the payment of $8,000, and our release from all lia-

bility to him, I regarded the Park Ditch Company as hopelessly insolvent. There was a mortgage of $6,000, and one of $3,600, to Hale upon the ditch, bearing interest at two per cent. per month from 1871 or 1872, the principal and interest on the notes due Hale amounting to about $15,000, which was secured by mortgage upon the ditch. Mr. Hale held other notes of the company, amounting to between $16,000 and $18,000, for which Kinna, Woolfolk and myself were security. We had no security except an indemnity mortgage on the ditch, which was subordinate to the other mortgages to Hale upon the ditch which I have mentioned. This indebtedness for which we were security was bearing interest at the rate of two per cent. per month. In the fall of 1873 Mr. Kinna and myself were uneasy on account of our large liability for the company for which we felt we had no security. We notified Hale at that time that he must take steps at once to collect this indebtedness against the Park Ditch Company, and that if he did not do so, we would be no longer responsible to him as sureties upon the notes. After we gave this notice there was a meeting of the trustees of the Ditch Company, to which I communicated a conversation which I had had with Hale, in which Hale proposed that if the company would assign the receipts of the season of 1874 to him, and we would during said season pay to him from the resources of the company the sum of $8,000 upon the indebtedness for which we were sureties, and would then sell the Park ditch under our indemnity mortgage, that Hale would bid at the sale of the ditch a sum sufficient to pay the amount for which we were security, and would discharge us from further liability to him thereon. Kinna and myself were in favor of this arrangement and Woolfolk also consented to it. The trustees of the company then passed a resolution in accordance with that proposition, pledging the receipts of 1874 to Hale, and Kinna, Woolfolk and myself made an agreement with Hale with

reference to the $8,000 payment and our release upon selling the ditch thereafter under our mortgage. My recollection is that Mr. Hudnall, as agent of Mr. Hale, was to collect the receipts under the agreement, which were all the receipts of the Park ditch, and one-third of the receipts of the Tucker Extension, the remaining two-thirds of the Extension receipts belonging to Woolfolk. During the year 1874, the total net receipts of the Park Ditch Company only amounted to about $3,500. This amount was increased by the sum of about $2,000, which I had formerly collected as treasurer and accounted for at this time. The total still lacked $2,572.10 of paying the $8,000 to Hale, in order to secure our release under the agreement. The receipts of the ditch in 1874 were not sufficient to pay the interest on the company's indebtedness. We were bound to pay this $2,572.10 in order to secure our release from the indebtedness for which we were still security to Hale, and which amounted, after deducting the payments then made, to about $11,000 or $12,000. We would have paid this $2,572.10 to Hale, as it was necessary to secure our release from our indebtedness to him, whether the receipts of 1875 had been assigned to us or not. We might not have borrowed the money if the statements of Woolfolk had not been made to us. If we had not borrowed the money, we would have simply walked up to Mr. Hale and paid him the money instead of borrowing the amount. We would have been compelled to pay him in some way, for he had our notes and we desired to be released. There was an agreement by the Park Ditch Company to make no defense to our action of foreclosure. I do not remember why the ditch was not sold until the 20th of January."

Kinna, plaintiff, testified as follows: "Ming, Woolfolk and myself were securities for the Park Ditch Company for $16,000 or $18,000 to R. S. Hale. Hale had agreed that if the Park Ditch Company would pay him that season $8,000 on the debt, he would release us as

sureties, or would buy in the ditch so as to release us, if
we sold it under our mortgage of indemnity.   The Park
Ditch Company had paid, at the end of the water season
of 1874, all of the $8,000 but this $2,572.10, and we bor-
rowed this amount from the National Bank in order to
pay the balance of the $8,000 and thus secure our release.
If we had not paid this amount, we would have had to
pay the balance of the $16,000 or $18,000 for which we
were liable as security to Hale for the company.   We
were compelled to pay the $2,572.10 out of our own
pockets, or else have remained responsible for $11,000 or
$12,000, the balance for which we were responsible as
security to Hale.   To a considerable extent I was induced
to join in borrowing this money in order to be released
from our liability to Hale as sureties.   I did not consider
the Park Ditch Company solvent.   I did not consider
that the mortgage of indemnity to us from the company
was any security to us for the indebtedness for which
we were liable as its sureties.   I can't say, as Mr. Ming
says, that I would have paid my part of the $2,572.10 in
cash if no representations had been made by defendant.
As I was not very flush in funds at that time, I should
probably have borrowed my portion of the money to
make up the $8,000 to Hale, if no representations had
been made by Woolfolk.   Of course, my principal object
in borrowing the $2,572.10 was to get released from the
$16,000 or $18,000 security debt to Hale.   I did not relin-
quish any security I held against the Park Ditch Com-
pany in consequence of the representations of Woolfolk
or the paper sued on.   We still held our mortgage of
indemnity, which was the only security we had.   I was
very glad to get the matter settled, and get out of our
liability to Hale.   I considered that in paying the $2,572.10
I was paying what I had to pay, and was saved, by doing
so, from paying a larger sum to Hale.   I think the note
for $2,572.10 was paid by us shortly after its execution.
I do not know what motive Woolfolk had in making the

representations that the water receipts of 1875 had been pledged to us by the company. He owned the largest interest in the company, and I suppose wanted to hold on to it as long as possible. I don't know why he wanted to close it out to Hale in order to get released from his third of the liability to him."

The foregoing was all the testimony in the case tending to show any consideration for the agreement sued on, and all in relation to any representations by defendant whereby plaintiffs were induced to enter into said agreement. At the conclusion of the testimony, the defendant moved for a non-suit for the reasons, among others: First, that there was no sufficient case made to go to the jury. Second, that there was no consideration shown for the execution of the agreement. Third, because no damage had been shown by reason of the alleged misrepresentations. Fourth, because the testimony shows that the plaintiffs, alike with defendant, were benefited and not injured by the $2,572.10 paid; and fifth, that the parties were under a legal obligation to pay said $2,572.10, and gave up no securities, placed themselves in no worse condition, and were in no way injured by the payment thereof or by reason of misrepresentations, if any were made.

The court granted the motion for non-suit, and this motion is assigned as error.

1. Was there any consideration for the agreement?

From the testimony it will be seen that in the fall of 1873 the Park Ditch Company was indebted to Hale in the sum of $16,000 or $18,000, for the payment of which the plaintiffs and defendant were sureties. The company was insolvent. They — the plaintiffs and defendant — had no security that was of any value. They were uneasy and wished to be released from their liability. They notified Hale to proceed against the company at once or they would be no longer responsible to him as sureties upon the notes he held against the company. Hale pro-

posed that if the company would assign the receipts of the season of 1874 to him, and the plaintiffs and defendant would make up to him what such receipts fell short of making the sum of $8,000 upon the indebtedness for which they were sureties, then upon a sale of the ditch upon their indemnity mortgage Hale would bid at the sale a sum sufficient to pay the amount for which they were sureties, and discharge them from any further liability to him.    This arrangement was consummated. The receipts of the ditch for 1874 were assigned to Hale, and the plaintiffs and defendant agreed to pay to him what such receipts fell short of making the sum of $8,000.    This is the agreement referred to in the contract sued on.

It will be observed that this $8,000 was a payment upon the indebtedness for which the plaintiffs and defendant were sureties, so that, in whatever part of said $8,000 they paid, they were simply discharging a legal obligation and liability that was upon them before the contract mentioned in the complaint had been made.    Before said contract was made, the $2,572.10 named therein might have been collected from them, and in paying that sum they were paying a debt that they could not escape paying, and that the contract did not in any manner affect. In entering into this agreement with Hale, to make up what the water receipts for 1874 fell short of making the sum of $8,000, they were contracting to pay so much on an indebtedness they already owed, and by the payment of which they made good their mortgage and relieved themselves from an indebtedness of $16,000 or $18,000.    In borrowing this $2,572.10 and making this payment, the same was as much for the benefit of plaintiffs as the defendent, and all the basis that the contract sued on has is the fact that they borrowed that sum for the purpose of making such payment.    The promise of the defendant to refund the money so borrowed was a mere naked promise without consideration.  The contract which

is made the basis of this action, and which expresses the consideration upon which the plaintiffs rely, is as follows, to wit:

"Whereas, John Kinna and John H. Ming have this day joined with me in borrowing the sum of $2,572.10, for the purpose of paying R. S. Hale the balance of $8,000 due him under private agreement with said Ming, Kinna and Woolfolk, in order for their release from certain notes executed by them to said Hale as security for the Park Ditch Company."

There is nothing in this but that three equal debtors joined together to borrow, and did borrow, money to pay a debt for which they were severally and jointly liable. It is not possible that so far there is any promise of or liability for Woolfolk to repay to Kinna and Ming their share of the money so borrowed and paid on their joint indebtedness.

The contract further recites: "And whereas the Park Ditch Company has pledged the note of William Chessman to it, and its claim against Felix Poznainsky, and any other demands due it, to the extent of repaying the said Kinna, Ming and Woolfolk the sum of $2,572.10, this day borrowed." This is vague and uncertain; but if anything can be ascertained in favor of plaintiffs, it is that the Park Ditch Company had theretofore pledged to Kinna, Ming and Woolfolk the notes therein mentioned to repay them the sum of $2,572.10 that day borrowed. But it is not seen, and cannot be seen thus far, wherein Woolfolk promised to pay anything to Kinna and Ming.

The contract continues: "Now, therefore, the said Woolfolk does hereby agree that if he shall collect any of the above amounts, or shall, from any resources of the Park Ditch Company, receive any other sums, after deducting all costs, charges and expenses, to apply the same in payment of said note, and also another note executed to R. S. Hale for taxes, amounting to between six and seven hundred dollars, until said notes shall be fully paid."

It is apparent from plaintiffs' complaint that the note for $600 to Hale was paid off by Kinna, Ming and Woolfolk. But it is said, "in payment of said note." What note? It could not be a note of Woolfolk to Kinna and Ming, or they would proffer it or show cause of its absence. Where the contract says, "said note," and also another note executed to R. S. Hale, the legal intendment is that both notes were the property of Hale; but this cannot be so, or these plaintiffs would not sue to recover on it without so stating in their complaint. From this examination of the latter clause of the contract, it is again seen conclusively that the whole matter was without consideration and void. And if the defendant did promise to pay "said note," and another note, in what does the consideration consist? None is mentioned in the writing. It was a mere naked promise for the payment of an uncertain amount out of uncertain proceeds, to uncertain parties in an uncertain manner, and at an uncertain time, without consideration in law and void.

2. Appellants, in their brief, rely upon the fact that: "This case has once before occupied the attention of this court (see 3 Mont. 380), and this identical contract was then subjected to judicial consideration and interpretation. It would be a little singular, to say the least of it, if this contract was in fact without consideration, that this court upon that appeal should have overlooked the matter, and remanded a case which was based upon a mere barren agreement in writing, to the district court for a new trial."

Appellants further say: "Although there is nothing expressly said in the opinion of the court concerning the sufficiency of the consideration, it was a matter within the issues, and which the court must have found in favor of appellants." The matter of the consideration could not have been an issue in this case, for whatever were the real facts in the case, the learned judge who delivered the opinion in the case, after setting out the contract,

says: "Said Ming and Kinna brought this action to recover from said Woolfolk the sums that are mentioned in the contract, and were paid by them to Hale."

Again, the opinion states, on page 385: "It appears that the appellants and respondent borrowed of R. S. Hale the sum of $2,572.10," etc.

It is not necessary to proceed further in a comparison of the cases, to see that a different case would exist if the money had in fact been borrowed from Hale, and respondent had agreed to pay the note which was given as the evidence of the debt. This is not the case.

Judgment is affirmed, with costs.

*Judgment affirmed.*